[909 NE2d 70, 881 NYS2d 377]

BORIS KHRAPUNSKIY et al., Respondents, v ROBERT DOAR, as Commissioner of the New York State Office of Temporary and Disability Assistance, Appellant.

Argued March 25, 2009; decided May 12, 2009

480

POINTS OF COUNSEL

*Andrew M. Cuomo, Attorney General,* New York City (*Oren L. Zeve, Barbara D. Underwood* and *Michelle M. Aronowitz* of counsel), for appellant. I. New York Constitution article XVII does not require the State of New York to provide public assistance at the Supplemental Security Income standard of need. (*Tucker v Toia,* 43 NY2d 1; *Matter of Bernstein v Toia,* 43 NY2d 437; *Lovelace v Gross,* 80 NY2d 419; *Matter of Barie v Lavine,* 40 NY2d 565; *Matter of Aliessa v Novello,* 96 NY2d 418; *Matter*

*of Lee v Smith,* 43 NY2d 453; *Pajak v Pajak,* 56 NY2d 394; *Matter of Zagoreos v Conklin,* 109 AD2d 281.) II. Equal protection does not compel a state to create a public assistance program to replace benefits denied by operation of federal law. (*Cleburne v Cleburne Living Center, Inc.,* 473 US 432; *Bower Assoc. v Town of Pleasant Val.,* 2 NY3d 617; *Dandridge v Williams,* 397 US 471; *Matter of Aliessa v Novello,* 96 NY2d 418.)

*Legal Aid Society,* New York City (*Scott A. Rosenberg* and *Steven Banks* of counsel), *Empire Justice Center,* Albany (*Barbara Weiner* of counsel), *New York Legal Assistance Group,* New York City (*Yisroel Shulman* and *Jane Stevens* of counsel), and *Weil, Gotshal & Manges LLP* (*Richard Slack* and *Idit Froim* of counsel), for respondents. I. The provision of lower assistance levels to elderly, blind and disabled immigrants based solely on immigration status violates the Equal Protection Clause. (*Mathews v Diaz,* 426 US 67; *Graham v Richardson,* 403 US 365; *Nyquist v Mauclet,* 432 US 1; *Matter of Aliessa v Novello,* 96 NY2d 418; *Bernal v Fainter,* 467 US 216; *Matter of Lee v Smith,* 43 NY2d 453; *Dandridge v Williams,* 397 US 471.) II. The State of New York's provision of lower assistance levels to equally needy classes of persons based on criteria unrelated to need violates article XVII of the New York State Constitution. (*Tucker v Toia,* 43 NY2d 1; *Matter of Lee v Smith,* 43 NY2d 453; *Rice v Perales,* 193 AD2d 1135; *People v Dozier,* 78 NY2d 242; *Goodwin v Wyman,* 330 F Supp 1038, 406 US 964; *Matter of Aliessa v Novello,* 96 NY2d 418; *Jiggetts v Grinker,* 75 NY2d 411; *Matter of Brown v Wing,* 170 Misc 2d 554, 241 AD2d 956.)

*Michael A. Cardozo, Corporation Counsel,* New York City (*Francis F. Caputo, Alan G. Krams* and *Karen M. Griffin* of counsel), for City of New York, amicus curiae. Neither article XVII of the State Constitution nor the federal or state Equal Protection Clauses require the State of New York to provide public assistance to plaintiffs at the Supplemental Security Income standard of need. (*Matter of Bernstein v Toia,* 43 NY2d 437; *Tucker v Toia,* 43 NY2d 1; *Baumes v Lavine,* 38 NY2d 296; *Rosado v Wyman,* 397 US 397; *Matter of Barie v Lavine,* 40 NY2d 565; *Dandridge v Williams,* 397 US 471; *Matter of Jones v Blum,* 64 NY2d 918; *Matter of Bates v Toia,* 45 NY2d 460.)

## OPINION OF THE COURT

JONES, J.

The question before the Court is whether under the State and

Federal Constitutions, plaintiffs are entitled to receive from the State the same level of benefits received by aged, blind or disabled United States citizens from the federal Social Security program. We hold that plaintiffs are not entitled to such benefits.

## I.

In New York State, eligible needy aged, blind or disabled individuals receive public assistance through Supplemental Security Income (SSI) from the federal government, along with additional state payments (ASP) provided by the State. The SSI program was established in 1972, effective in 1974, by the United States Congress to provide aid to individuals who because of their physical condition were unable to support themselves (42 USC § 1381 *et seq.*). The federal government manages SSI/ASP payments and makes all administrative and eligibility determinations (Social Services Law § 211).

Prior to 1974, New York State provided public assistance under its own program entitled "Aid to the Aged, Blind and Disabled" (AABD) pursuant to former Social Services Law, article 5, title 6. As a result of the federal takeover of this category of public assistance, the State discontinued the AABD program and repealed the old law. But in order to ensure that the benefits provided would not be less than whatever current benefits were being received after the transfer from state to federal funding, Congress required the states to provide a mandatory minimum supplement so that total aid was at least equal to the pre-SSI levels. New York therefore adopted a new title 6 of article 5 of the Social Services Law, entitled Additional State Payments for Eligible Aged, Blind and Disabled Persons (Social Services Law §§ 207-212), which provided additional state payments to the aged, blind and disabled who either received federal SSI payments (*see* 42 USC § 1381 *et seq.*), or whose income or resources, though above the standard of need for the SSI program, was not sufficient under Social Services Law § 209 (2). At the time ASP was adopted, eligibility was limited to aged, blind or disabled persons who were residents of New York State and either United States citizens or aliens who had not been determined by an appropriate federal authority to be unlawfully residing in the United States.

In 1996, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA) (Pub L 104-193 tit IV, codified at 8 USC § 1601 *et seq.*), otherwise

known as the "Welfare Reform Act," which restricted alien eligibility for federally funded public assistance benefits and authorized the states to follow suit with their own programs. Under PRWORA, legal aliens who do not become United States citizens in seven years lose their SSI and ASP benefits. Thereafter, in 1998, New York's Social Services Law § 209 (1) (a) (iv) was amended to limit eligibility for ASP to residents of the state who, if not citizens of the United States, are aliens eligible for federal benefits. The purpose of the amendment was to conform state law with federal law and to "make clear which aliens may be eligible for state supplementation of the federal supplemental security income program" (Senate Mem in Support of L 1998, ch 214, 1998 McKinney's Session Laws of NY, at 1667). Therefore, when Congress created a class of legal aliens who would become ineligible for SSI/ASP benefits, the State discontinued supplemental support for this class under Social Services Law § 209 and, instead, provided public assistance pursuant to Social Services Law § 131-a (2), also known as the state-funded "safety net assistance" (SNA) provision. Under the "safety net" program, eligible individuals would receive approximately $352 in the form of a shelter allowance, a basic grant, a home energy allowance, a supplemental home energy allowance and a fuel allowance if heat is not included in rent (*see Brownley v Doar*, 12 NY3d 33, 39 n 2 [2009]).

## II.

Plaintiffs are aged, blind or disabled persons and legal resident aliens of New York State who became ineligible for SSI payments and ASP because they did not become citizens in the time frame mandated by the United States Congress in the PRWORA or were never eligible for SSI/ASP by virtue of the act. Plaintiffs commenced this action against defendant Commissioner of the New York State Office of Temporary and Disability Assistance (OTDA) in 2004 and moved for class certification and a preliminary injunction. In an amended complaint filed in March 2005, plaintiffs alleged that defendant failed to provide legal immigrants with assistance consistent with the standard of need in Social Services Law § 209 (2) for aged, blind or disabled persons based solely on their immigration status, without regard to their need, and in violation of article XVII of the New York State Constitution, because SSI/ASP benefits totaled $761 per month whereas SNA provided $352 in monthly support. The amended complaint also alleged a violation of the

Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution and article I, § 11 of the New York State Constitution. Plaintiffs sought an order requiring OTDA to provide retroactive payments and ongoing assistance in an amount consistent with Social Services Law § 209 (2). Supreme Court granted plaintiffs' motions for certification, certifying a class defined as "All persons identified to, or identifiable by, defendant as elderly, blind, and disabled persons lawfully residing in New York State who have received, are receiving, or will receive assistance at less than the standard of need set out in [Social Services Law §] 209 (2), solely because of their immigration status," and summary judgment (9 Misc 3d 1109[A], 2005 NY Slip Op 51462[U], *8). The court held that OTDA's failure to provide assistance to plaintiffs and the class at the standard of need for the elderly, blind and disabled set out in Social Services Law § 209 (2) violates article XVII, § 1 of the State Constitution and the right of plaintiffs and the class to the equal protection of the laws under the Federal and State Constitutions. The court therefore permanently enjoined OTDA from failing to provide assistance to plaintiffs and the class consistent with the standard of need set out in Social Services Law § 209.

The Appellate Division affirmed the order of Supreme Court holding that plaintiffs were entitled to receive public assistance under SNA at the level of citizens under SSI/ASP, as set forth in Social Services Law § 209 (2) (49 AD3d 201 [2008]). Plaintiffs were thereby entitled to state safety net assistance pursuant to Social Services Law § 131-a (2) plus an additional payment by the State sufficient to bring their benefits up to the SSI/ASP level. The Appellate Division granted defendant leave to appeal and certified the following question to this Court: "Was the order of Supreme Court, as affirmed by this [c]ourt, properly made?" We answer this question in the negative.

### III.

OTDA argues that article XVII of the New York State Constitution does not require the State to provide SNA public assistance at the Social Services Law § 209 (2) SSI/ASP standard of need. According to OTDA, State Constitution, article XVII, § 1 requires the State to provide for the needy in a "manner and by such means, as the legislature may from time to time determine" but does not mandate a particular level of aid to any individual or class; and Social Services Law § 209 (2) sets a standard of

need for recipients of SSI but is not a general standard of need or independent financial commitment by the Legislature to a class of all aged, blind or disabled individuals who are ineligible for federal Social Security benefits.

OTDA further argues that equal protection does not compel the State to create a public assistance program to provide benefits discontinued by operation of federal law. OTDA contends that plaintiffs are not being treated unequally by the State because they have failed to identify any New York resident who receives public assistance from the State at the Social Services Law § 209 standard of need.

Plaintiffs claim the State violates article XVII of the State Constitution because it does not provide for SNA at the standard of need set forth and defined in Social Services Law § 209 (2). Specifically, plaintiffs note that article XVII of the State Constitution requires the State to provide for the aid, care and support of the needy, and argue that section 209 (2) establishes a standard of need for all needy elderly and disabled lawful residents of the state, whether or not they are citizens of the United States. As such, plaintiffs argue, the State by failing to provide SNA benefits in an amount equal to the level set forth in section 209 (2) violates article XVII of the State Constitution.

## IV.

At the outset, we note that ASP is not a stand-alone program which sets a "standard of need" for all elderly, blind or disabled individuals within the state. ASP, a supplement to the SSI program established by the federal government and Social Services Law § 209 (2), merely sets forth "the standard of monthly need for determining eligibility for and the amount of additional state payments." ASP represents a supplementary monetary amount which is included in the single check received by SSI recipients from the federal Social Security Administration (SSA) which administers SSI and ASP together.

While it is true that New York State did have a public assistance program, AABD, which provided for the needy aged, blind or disabled, it discontinued that separate program more than 30 years ago when the federal government began providing for this population through the SSI program in 1974. The federal government set the SSI benefit level; however, participant states

were required to supplement the federal contribution.[1] In order to fulfill the requirement of participation by the State, the Legislature enacted ASP, turning control of its AABD program over to the federal government and providing a small contribution to SSI. In order to avoid a reduction in benefits upon the transfer to the SSI program, a mandatory minimum state supplement for those who received AABD in December 1973 was set forth in Social Services Law § 210 (*see* 42 USC § 1382e). Failure to enact the mandatory minimum supplement or the mandatory maintenance of effort supplement results in a penalty to the State's federal Medicaid funding (*see* 42 USC § 1382g [a]). With the foregoing as a backdrop, we first consider the parties' claims under article XVII of the State Constitution.

Article XVII, § 1 requires the State to provide for the aid, care and support of the needy. This provision "was intended to serve two functions: First, it was felt to be necessary to sustain from constitutional attack the social welfare programs . . . created by the State . . . and, second, it was intended as an expression of the existence of a positive duty upon the State to aid the needy" (*Tucker v Toia*, 43 NY2d 1, 7 [1977]).

> "[T]he provision for assistance to the needy is not a matter of legislative grace; rather, it is specifically mandated by our Constitution. Section 1 of Article XVII of the New York State Constitution declares: 'The aid, care and support of the needy are public concerns and shall be provided by the state and by such of its subdivisions, and in such manner and by such means, as the legislature may from time to time determine' " (*Tucker*, 43 NY2d at 7).

However, article XVII, § 1 of the State Constitution, which requires the State to provide for the aid, care and support of the needy, does not "mandate that public assistance must be granted on an individual basis in every instance," nor does it command that "the State must always meet in full measure all the legitimate needs of each [public assistance] recipient" (*Matter of Bernstein v Toia*, 43 NY2d 437, 448-449 [1977]). In *Bernstein*, this Court upheld the replacement of individual grants for shelter with a flat grant based upon fiscal constraints and the need to optimize available public assistance moneys. In our

---

**1.** In 1976, Congress enacted a maintenance of effort rule which required states to provide "supplementary payments" in an amount no lower than their December 1976 levels (*see* 42 USC § 1382g).

recent decision *Brownley v Doar* (12 NY3d at 43-44), we reiterated that it is the prerogative of the Legislature to determine who is needy and to allocate public funds.

■ When the federal government enacted PRWORA the State amended ASP to mirror SSI's new eligibility criteria; individuals who became ineligible for SSI because of this federal change regarding citizenship became eligible only for "safety net" assistance. On the other hand, the decisions by the courts below require the State to set up an entirely new public assistance program to pay the difference between SSI/ASP benefits ($761) and what SNA currently provides ($352). As aptly pointed out by OTDA, this would be an ever-increasing amount over which the Legislature has no control and would create a disparity in the monthly aid received by other recipients of SNA. We hold that article XVII does not compel the State to assume the federal government's obligation when an elderly or disabled person becomes ineligible for continued SSI/ASP benefits.

■ Next, we examine the parties' equal protection claims. In considering whether a state statute violates the Equal Protection Clause, the Supreme Court applies different levels of scrutiny to different types of classifications. As a general rule, the Supreme Court has strictly scrutinized state laws that create alienage classifications when distributing or regulating economic benefits. Under strict scrutiny, a state statute will withstand an equal protection challenge only when the state can show that the law "furthers a compelling state interest by the least restrictive means practically available" (*see Bernal v Fainter*, 467 US 216, 227 [1984]). However, the strict scrutiny test is to be invoked only where a challenged law can be said to create classifications drawn along suspect lines. In the instant case, the alienage restriction embodied in Social Services Law § 209 (1) (a) (iv) was mandated by federal law (PRWORA). In conforming the New York statute to mirror the federal law, the State did not create a classification drawn along suspect lines. Because the State did not create a program of benefits which excluded plaintiffs, levels of scrutiny are inapplicable and there is no basis for an equal protection challenge.

In support of their equal protection argument, plaintiffs rely on *Matter of Aliessa v Novello* (96 NY2d 418 [2001]) where this Court held that Social Services Law § 122 violated the Equal Protection Clauses under the Federal and State Constitutions by denying Medicaid benefits funded solely by the State to plaintiffs based on their status as legal aliens. In *Aliessa*, we

concluded that Social Services Law § 122 was subject to—and could not pass—strict scrutiny because New York enacted a state-based program which provided benefits to citizens but denied the same benefits to aliens (96 NY2d at 436). This Court determined that the concept of need played no part in the operation of the statute, which could not be justified on the basis of a distinction between "qualified aliens," i.e., aliens who are lawfully admitted for permanent residence (generally, green card holders) or otherwise validly residing in the United States, and those permanently residing in the United States under color of law, i.e., aliens of whom the Immigration and Naturalization Service is aware but has no plans to deport, on the one hand, and citizens on the other.

Plaintiffs also cite to *Matter of Lee v Smith* (43 NY2d 453 [1977]). In *Lee*, a plaintiff on SSI received less in benefits than persons who were not disabled and who received public assistance under "home relief." This Court held that Social Services Law § 158 (a), which provided that a "person who is receiving federal supplemental security income payments and/or additional state payments shall not be eligible for home relief,"[2] was unconstitutional as applied to such recipients because it violated the equal protection guarantees of the Federal and State Constitutions.

Plaintiffs' and the dissent's reliance on *Aliessa* and *Lee* is misplaced. *Aliessa* and *Lee* are distinguishable from the instant case because they both involved a state-funded program—in *Aliessa*, a Medicaid program, and in *Lee*, a home relief program. In *Lee*, exclusion was based on the source of the income, even though the income was below the standard for receiving home relief. In *Aliessa*, the federal Medicaid program imposed a nationwide policy in which benefits were not available to aliens. However, federal law permitted the states to create a state-funded program. New York enacted such a program which provided benefits to citizens but excluded assistance to aliens. This Court found those exclusions impermissible.

Here, contrary to the view of plaintiffs and the dissenting Judges, there is no equal protection violation. There is no longer a state program of "Aid to the Aged, Blind and Disabled." The AABD program ceased in 1974 when SSI came into being

---

2. "Home relief" was the precursor of the current "safety net program" and in some instances provided a greater payment amount than the payment received by SSI recipients.

and no state program replaced it when public assistance to that class of individuals was relinquished to the federal government (*see* Social Services Law § 2 [19]).[3] As there is no state program of aid for this class, there are *no* state residents receiving public assistance from New York at the level requested by plaintiffs. Simply put, the right to equal protection does not require the State to create a new public assistance program in order to guarantee equal outcomes under wholly separate and distinct public benefit programs. Nor does it require the State to remediate the effects of PRWORA.

In 1998, when the Legislature amended Social Services Law § 209 (1) (a) (iv), it was fully aware of the consequences. The Legislature is charged with providing for the needy; however, it does so mindful of the State's resources. When the State eliminated its AABD program, it was with the understanding that the federal government would be responsible for this class of needy individuals and that the State would provide a smaller supplementary payment. In short, enactment of a new public assistance program requires legislative action.

Accordingly, the order of the Appellate Division should be reversed, without costs, judgment granted declaring in accordance with this opinion and the certified question answered in the negative.

CIPARICK, J. (dissenting). Because the majority today forecloses the availability of benefits at an appropriate standard of need to some of our indigent elderly, blind and disabled New Yorkers based solely on their immigration status, and because our precedents in *Matter of Lee v Smith* (43 NY2d 453 [1977]) and *Matter of Aliessa v Novello* (96 NY2d 418 [2001]) compel a holding in favor of plaintiffs, I respectfully dissent and would hold that Social Services Law § 122 (1) (f) and § 209 (1) (a) (iv) are unconstitutional and violative of article XVII of the New York State Constitution and the Equal Protection Clauses of both the United States and New York State Constitutions, and would affirm the order of the Appellate Division.[1]

All of the 20 named plaintiffs are indigent and elderly, blind or disabled legal aliens and residents of New York State. Some

**3.** Under section 2 (19), public assistance refers to family assistance, safety net assistance and veteran assistance.

**1.** Social Services Law § 122 (1) (f) provides:
"An alien who is not ineligible for federal supplemental security income benefits by reason of alien status shall, if otherwise eligible, be eligible to receive additional state payments for aged,

are refugees who fled religious or political persecution in their home countries. Many of them are now ineligible for federal Supplemental Security Income (SSI) benefits simply because they did not attain citizenship within a seven-year period as required by federal statute; in some cases due to long delays in the processing of their applications as a result of hardships caused by age and poor health or lack of English-language skills. Although plaintiffs may have once been eligible for SSI and additional state payments (ASP) under Social Services Law § 209, they became ineligible by virtue of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA) in 1996 (8 USC § 1601 *et seq.*) and conforming state enactments.

## I

New York has a long history of providing for its poor elderly, blind and disabled. New York State Constitution, article XVII, § 1 makes clear that aid for the needy is a public concern. It "imposes upon the State an affirmative duty to aid the needy . . . [and] unequivocally prevents the Legislature from simply refusing to aid those whom it has classified as needy" (*see Tucker v Toia*, 43 NY2d 1, 8 [1977]; *Matter of Aliessa v Novello*, 96 NY2d 418, 428 [2001]; *Jiggetts v Grinker*, 75 NY2d 411, 416 [1990]).

In 1930, in enacting a statewide system of old age relief, the Legislature declared that providing for aged or disabled persons in need is a "special matter of state concern and a necessity in promoting the public health and welfare" (Public Welfare Law § 122, added by L 1930, ch 387). In 1937, the Legislature enacted a similar bill for the blind, replacing a 1922 law, and declared that assistance for the blind is a "special matter of state concern" (Public Welfare Law § 112, added by L 1937, ch 15, § 7). Nowhere in these provisions was any restriction based upon alienage—all legal residents of this state who were elderly, blind or disabled received assistance for decades under the State's Aid to the Aged, Blind and Disabled (AABD) program.

---

blind or disabled persons under section two hundred nine of this chapter."

Social Services Law § 209 (1) (a) (iv) provides:

"An individual shall be eligible to receive additional state payments if he: . . . is a resident of the state and is either a citizen of the United States or is not an alien who is or would be ineligible for federal supplemental security income benefits solely by reason of alien status."

In 1974, in enacting Social Services Law § 209, the Legislature further established its commitment to the special needs for all elderly, blind and disabled in this state. Since 1974, Social Services Law § 209 (2) ensured New York's standard of need for poor elderly, blind and disabled. It provides that the needs of those whose incomes are below the standard receive ASP. Since 1974, New York supplemented the federal SSI payment with ASP to meet its standard of need for plaintiffs' class. Those whose income was too great to qualify for SSI but still fell below the established standard of need likewise received ASP. All poor elderly, blind and disabled, including legal aliens like plaintiffs, whose incomes were below the standard of need, received ASP payments.

In 1996, however, Congress rendered plaintiffs and other legal immigrants ineligible for SSI benefits. It also ceased to administer ASP payments on behalf of these legal residents merely because of their inability, for whatever reason, to become naturalized. In conforming its statutes to the new federal proscriptions, the Legislature directly denied plaintiffs' class assistance at the same level as citizens or qualifying aliens receiving aid pursuant to the "standard of need," as set by Social Services Law § 209. Plaintiffs still receive some public assistance, under the safety net assistance program, administered pursuant to Social Services Law § 131-a (2). Those payments, however, are substantially less than those for identically situated SSI and ASP recipients.[2]

The State's claim that the Legislature contemplated a system of supplemental aid only for those eligible for SSI benefits is incorrect. Section 209 applies equally to those who are ineligible for SSI. It is not tied to SSI benefits, nor is there reason to suppose that the standard was artificially inflated by reason of the availability of SSI. It certainly is not circumscribed by any immigration classification. In using the term of art "standard of monthly need," the Legislature used a term found throughout the Social Services Law that is strictly need-based. The concept of a standard of need dependent upon alienage, instead of financial need, is incongruous to the plain meaning of the term "standard of need."

---

2. Effective January 1, 2009, an individual living alone in New York State who is eligible for SSI receives $674 per month in federal benefits and $87 in additional state payments. As a result of Social Services Law § 209 (1) (a) (iv) and § 122 (1) (f), an identically situated individual in New York City not now eligible for SSI receives $352 per month.

Furthermore, when the Legislature enacted sections 207-209, it established the standard of need at a higher level than SSI. All New York residents were eligible for additional state payments, including either "a citizen of the United States or . . . an alien who has not been determined by an appropriate federal authority to be unlawfully residing in the United States" (L 1974, ch 1080, § 1, adding Social Services Law § 209 [1] [a] [iv] [subsequently amended by L 1998, ch 214, § 8]). In support of this legislation, the Governor's Program Bill Memorandum said: "The federal program provides a uniform standard of need (and payment) nationwide; unfortunately, that standard is far lower than the standard of need for these same persons under the state's former AABD program" (1974 NY Legis Ann, at 147). The Legislature further reaffirmed its commitment

> "to meeting the income needs of aged, blind and disabled persons who are receiving basic supplemental security income benefits or whose income and resources, though above the standard of need for the supplemental security income program, is not sufficient to meet those needs. In order to maintain assistance for such persons at a level consistent with their needs . . . there is hereby established a state-wide program of additional state payments for aged, blind and disabled persons" (Social Services Law § 207).

In fact, Governor Wilson, in supporting the legislation, stated that the federal SSI program "completely failed to meet the special needs of this group" (Governor's Approval Mem, Bill Jacket, L 1974, chs 1080, 1081, reprinted in 1974 NY Legis Ann, at 434). He added that sections 207 and 209 "represent a commitment of State funding to mitigate the omissions and inequities of the Federal program" (id.).

Considering the Legislature found SSI benefits to be grossly inadequate, it certainly would not have envisioned today's payments to needy legal aliens at almost half that of the level of SSI payments. Nor would the Legislature have made clear its intention to continue making additional state payments even if the federal government did not continue administrating the SSI program, if it really had intended to base its standard of need on SSI eligibility alone (1974 NY Legis Ann, at 147). There is simply no evidence that the State viewed the availability of SSI as extinguishing its underlying obligation to these specially needy residents. Thus, the State cannot relinquish its obligation

to provide legal residents assistance at the statutorily created standard of need, and to do so now impermissibly imports non-need-based restrictions on immigrant eligibility into the state assistance program for the elderly, blind and disabled.

The majority's position is thus inconsistent with the long tradition in New York of fully providing assistance to the poor aged, blind and disabled, and is contrary to our controlling case of *Aliessa* (*see* 96 NY2d at 429). There, we held that Social Services Law § 122 (1) (c) violated the "letter" and "spirit" of article XVII of the State's Constitution by denying state-funded Medicaid benefits on the basis of immigration status by "imposing on plaintiffs an overly burdensome eligibility condition having nothing to do with need and depriving them of an entire category of otherwise available basic necessity benefits" (*id.* at 429). The Legislature had terminated Medicaid for noncitizens to mirror the 1996 federal restrictions. However, New York chose to extend Medicaid benefits to more individuals than the federal plan. In doing so, New York could not provide less aid based upon immigration status (*id.*).

Contrary to the majority, our holding in *Matter of Lee v Smith* (43 NY2d 453, 463 [1977]), indeed, lends support to plaintiffs' position here. There, we stated:

> "While the State's adoption of the SSI program means that the Federal Government generally assumes the costs of administration in providing for the aged, disabled and blind, the State's duty remains. The obligation cannot be avoided by irrevocably assigning the aged, disabled and blind to the Federal program without recourse to State aid, when in many cases this means that they must survive on lesser amounts than are granted to other needy persons in the State" (*id.*).

The majority's attempt to limit the holdings of these cases is most regrettable. Here, New York, by adding section 122 (1) (f) to the Social Services Law and amending Social Services Law § 209 (1) (a) (iv), has improperly imported federal restrictions on alien eligibility for benefits, and in doing so has violated article XVII of our State Constitution.

## II

Turning to plaintiffs' equal protection claims, contrary to the majority, I believe that the Legislature, in enacting these conforming statutes, acted impermissibly and in violation of the

Equal Protection Clauses under both our Federal and State Constitutions. We held in *Aliessa* that legal residents are entitled to equal protection under the law (*see* 96 NY2d at 435-436). The Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws" (US Const, 14th Amend, § 1). The New York State Constitution contains its own equal protection requirement (*see* NY Const, art I, § 11). We said, "[i]t is axiomatic that aliens are 'persons' entitled to equal protection" (*Aliessa* at 430, quoting *Yick Wo v Hopkins*, 118 US 356, 369 [1886] ["The fourteenth amendment to the constitution is not confined to the protection of citizens"]; *see also Mathews v Diaz*, 426 US 67, 77 [1976]).

In considering whether a state statute violates the Equal Protection Clause, the Supreme Court applies different levels of scrutiny to different types of classifications (*see Clark v Jeter*, 486 US 456, 461 [1988]). As we noted in *Aliessa*, the Supreme Court generally has strictly scrutinized state laws that create classifications based upon immigration status when distributing economic benefits (*see e.g. Bernal v Fainter*, 467 US 216, 227-228 [1984] [invalidating a Texas statute that required citizenship for notaries public]; *Nyquist v Mauclet*, 432 US 1, 7-12 [1977] [striking down a New York statute that restricted eligibility for Regents college scholarships based on alienage]).

Under the strict scrutiny standard, a state statute will withstand an equal protection challenge only when the state can show that the law "furthers a compelling state interest by the least restrictive means practically available" (*Bernal*, 467 US at 227). Recognizing that "discrete and insular minorities" can be shut out of the political process, the United States Supreme Court has applied a more searching inquiry to statutes that draw classifications aimed at these groups (*see United States v Carolene Products Co.*, 304 US 144, 153 n 4 [1938]). In *Graham v Richardson* (403 US 365, 372 [1971]), the Court held that, as a class, aliens are a "prime example of a 'discrete and insular' minority . . . for whom such heightened judicial solicitude is appropriate." Lawful resident aliens benefit our country in a great many ways as they contribute to our economy, serve in the Armed Forces and pay taxes; however, they cannot vote, which puts them in a weaker position (*see Aliessa* at 431, citing *Hampton v Mow Sun Wong*, 426 US 88, 107 n 30 [1976]).

Here, applying a strict scrutiny standard, as we did in *Aliessa*, defendant does not contend that it has a compelling interest for allowing residents to receive less assistance based upon

immigration status. Defendant claims and the majority agrees that "[b]ecause the State did not create a program of benefits which excluded plaintiffs, levels of scrutiny are inapplicable and there is no basis for an equal protection challenge" (majority op at 487), and it is not discriminating against the plaintiffs' class. However, as the Appellate Division explained below, the essential issue is whether in amending the Social Services Law to exclude residents previously eligible for ASP, it did so on permissible grounds. Defendant has not provided any "compelling government interest" in providing plaintiffs' class with a significantly lower level of assistance based upon their status. The current enactment that provides assistance to citizens and certain conforming immigrants is overly burdensome and without any justification, and prohibited by the Equal Protection Clause.

In conclusion, the majority today has turned its back on the history of New York's commitment to protect its most fragile and vulnerable populations, and insists that an affirmance here would require the State to set up an entirely new public assistance program requiring legislative action. Certainly, legislative action in this area would be welcomed as provision of lower assistance levels to elderly, blind and disabled immigrants based solely upon alienage violates the Equal Protection Clauses of both the Federal and State Constitutions. Likewise, the provision of lower assistance levels to equally needy classes of persons based on criteria unrelated to need violates article XVII of the New York State Constitution. Therefore, I would hold Social Services Law § 122 (1) (f) and § 209 (1) (a) (iv) to be unconstitutional.

Accordingly, I would affirm the order of the Appellate Division below.

Judges GRAFFEO, READ, SMITH and PIGOTT concur with Judge JONES; Judge CIPARICK dissents and votes to affirm in a separate opinion in which Chief Judge LIPPMAN concurs.

Order reversed, etc.